# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| South Huntington Water District, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> SIGMA CORPORATION, MCWANE, INC. and STAR PIPE PRODUCTS, LTD., <br><br> Defendants. | No. <br><br> CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF <br> <u>JURY TRIAL DEMANDED</u> |

Plaintiff, South Huntington Water District, on behalf of itself and all other similarly-situated municipal indirect end user purchasers, demands trial by jury of all claims properly triable thereby against Defendants named herein, and complains and alleges, based on personal knowledge as to its own acts and on information and belief as to the acts of others, as set forth herein. The majority of evidence in support of Plaintiff's claims is in Defendants' exclusive possession, custody or control.

## NATURE OF ACTION

1. This case arises out of an unlawful conspiracy among Defendants and their co-conspirators that had the purpose and effect of raising and fixing prices in the market for ductile iron pipe fittings ("DIPF") throughout the United States.

2. Beginning in January 2008 and continuing through January 2009 (the "Class Period"), Sigma Corporation ("Sigma"), McWane, Inc. ("McWane") and Star Pipe Products,

Ltd. ("Star"), conspired to raise and stabilize the prices at which DIPF are sold in the United States. Sigma, McWane and Star (collectively, the "Defendants") exchanged sales data in order to facilitate this price coordination.

3.      Plaintiff indirectly purchased DIPF during the Class Period.  As a direct and proximate result of the unlawful conduct and conspiracy of Defendants alleged herein, Plaintiff and other members of the Classes (defined below) have paid more during the Class Period for DIPF than they otherwise would have paid in a competitive market and have therefore been injured in their respective businesses and property.

4.      Plaintiff brings this class action lawsuit for injunctive relief pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and to recover damages under state antitrust and unfair competition laws, and common law principles of unjust enrichment, as well as to recover the costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiff and all others similarly situated sustained as a result of the Defendants' conspiracy to fix, raise, maintain and stabilize the prices of DIPF.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), to obtain injunctive relief under for violations of Section 1 of the Sherman Act (15 U.S.C. § 1), and to obtain damages for state antitrust law violations and to recover the cost of the suit, including reasonable attorneys' fees, for injuries that Plaintiff and all others sustained as a result of the Defendants' violations of those laws. This court has subject matter jurisdiction of these claims under Title 28, United States Code, Sections 1331 and 1337. This Court has subject matter jurisdiction over the state law claims pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d) and 1367, in that this is a class

action in which the members of each of the Classes exceed 100; the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs; and some members of each of the proposed Classes are citizens of a state different from some Defendants.

6.    Venue is proper in this district pursuant to 28 U.S.C. §§ 15, 22 and 26 and pursuant to 28 U.S.C. § 1391(b), (c) and (d), because, at all times relevant to the Complaint, (a) Defendants transacted business, were found, are headquartered or acted through subsidiaries or agents present in this District; (b) a substantial part of Plaintiff's claims occurred in New Jersey; and (c) a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

7.    This Court has *in personam* jurisdiction over each of the Defendants because, *inter alia*, each of the Defendants: (a) committed acts in this district in furtherance of the conspiracy alleged herein and directed the unlawful conspiracy through persons and entities located in this district, including fixing the prices of DIPF sold to purchasers in this district; (b) transacted business in DIPF and other products in this district; (c) maintained continuous and systemic contacts with this district prior to and during the Class Period; and (d) purposefully availed itself of the benefits of doing business in this district. Accordingly, each of the Defendants maintains minimum contacts with this district which are more than sufficient to subject it to service of process and to comply with due process of law.

8.    Defendants' conspiracy to fix the price of DIPF has substantially affected commerce throughout the United States and in each of the states identified herein because Defendants, directly or through their agents, engaged in activities affecting each such state. The conspiracy described herein adversely affected every person nationwide, and more particularly, water districts in each of the states identified in this Complaint, who indirectly purchased

3

Defendants' DIPF Products. Defendants' conspiracy has resulted in an adverse monetary effect on indirect government purchasers in each state identified herein. Defendants have purposefully availed themselves of the laws of each of the states identified herein in connection with their activities relating to the production, marketing, and sale of DIPF. Defendants produced, promoted, sold, marketed, and/or distributed DIPF, thereby purposefully profiting from access to indirect-purchasers in each such state. Defendants also contracted to supply or obtain goods or revenue related to the business for DIPF. As a result of the activities described herein, Defendants have:

      a. Caused damage to the residents of every state, including the states identified herein;

      b. Caused damage in every state, including each of the states identified herein, by acts or omissions committed outside each such state by regularly doing or soliciting business in each such state;

      c. Engaged in persistent courses of conduct within every state and/or derived substantial revenue from the marketing of DIPF; and

      d. Committed acts or omissions that they knew or should have known would cause damage (and did, in fact, cause such damage) in every state while regularly doing or soliciting business in each such state, engaging in other persistent courses of conduct in each such state, and/or deriving substantial revenue from the marketing of DIPF in each such state.

## PLAINTIFF

9.     Plaintiff, South Huntington Water District (hereinafter "SHWD"), is a municipal corporation organized under the laws of the State of New York with its headquarters located at

4

75 Fifth Avenue, Huntington Station, New York 11746. Since 1925 it has provide potable water to commercial and residential customers in the Town of Huntington. It currently serves approximately 81,000 people daily.

10. SHWD is an indirect purchaser of domestic and imported DIPF which it acquires for its own use. SHWD purchased DIPF indirectly from Defendants during the relevant Class Period.

## DEFENDANTS

11. Defendant Sigma Corporation ("Sigma") is a corporation organized, existing and doing business under the laws of the State of New Jersey, with its principal place of business located at 700 Goldman Drive, Cream Ridge, New Jersey 08154. Sigma imports, markets and sells DIPF throughout the United States.

12. Defendant McWane, Inc. ("McWane") is a corporation organized, existing and doing business under the laws of the State of Delaware, with its principal place of business located at 2900 Highway 280, Suite 300, Birmingham, Alabama 35223. McWane imports, markets and sells DIPF throughout the United States.

13. Defendant Star Pipe Products, Ltd. ("Star Pipe") is a limited partnership organized, existing and doing business under and by virtue of the laws of the State of Texas, with its principal place of business located at 4018 Westhollow Parkway, Houston, Texas 77082. Star Pipe imports, markets and sells DIPF throughout the United States.

## AGENTS AND CO-CONSPIRATORS

14. The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

15.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

16.     Each Defendant acted as the principal or agent for other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

## FACTUAL ALLEGATIONS

### The DIPF Industry

17.     DIPF are a component of pipeline systems transporting drinking and waste water under pressurized conditions in municipal distribution systems and treatment plants. DIPF are used to join pipes, valves and hydrants in straight lines, and to change, divide or direct the flow of water. The end users of DIPF are typically municipal and regional water authorities.

18.     DIPF are produced in a broad product line of more than 2000 unique configurations of size, shape and coating. The industry differentiates between "A Items," or commonly used fittings used routinely and on almost every job, and "oddball" fittings that are either of unusual configuration or size, or both. Although approximately 80 percent of market demand may be serviced with a product line of 100 fittings, DIPF suppliers must be able to supply more than 1900 additional fittings to serve the remaining 20 percent of demand.

19.     Independent wholesale distributors, known as "waterworks distributors," constitute the primary channel of distribution of DIPF to end users. Waterworks distributors specialize in distributing products for water infrastructure projects, and generally handle the full spectrum of waterworks products, including pipes, DIPF, valves and hydrants. Waterworks distributors employ sales personnel dedicated to servicing the needs of end users, and are

generally able to satisfy the needs of end users for rapid service by stocking inventory in relatively close proximity to project sites.

20.     Direct sales of DIPF to end users, or to the utility contractors that often serve as the agent of the end user in purchasing and installing DIPF, are uncommon. End users and DIPF suppliers alike prefer to work through waterworks distributors with locations near project sites. As a result, DIPF suppliers need to distribute DIPF through local waterworks distributors in each region of the country in order to compete effectively in that region.

21.     Both imported and domestically produced DIPF are commercially available. All of the Defendants sell imported DIPF. Before Star's entry into domestic production in 2009, McWane was the sole domestic producer of a full line of small and medium-sized DIPF.

22.     Senior executives of the Defendants frequently and privately communicate with one another. These communications often relate to DIPF price and output.

### The Price Fixing Conspiracy

23.     Beginning in January 2008, the Defendants conspired to raise and stabilize the prices at which DIPF were sold in the United States.

24.     Due to rising input costs, all of the Defendants desired price increases in 2008. However, McWane was concerned that Sigma and Star would not adhere to announced price increases, which would result in lost sales for McWane. The Defendants worked together though 2008 to alleviate McWane's concerns, with the common purpose of clearing the way for McWane to support common price increases.

25.     On January 11, 2008, McWane publicly announced its first DIPF price increase of 2008. Sigma and Star followed this price increase.

7

26.    This January 2008 price increase was the result of a combination and conspiracy among the Defendants.

      a.  Before announcing the January 2008 price increase, McWane planned to trade its support for higher prices in exchange for specific changes to the business methods of Sigma and Star that would reduce the risk that local sales personnel for these competitors would sell DIPF at prices lower than published levels.

      b.  McWane communicated the terms of its plan to Sigma and Star. McWane acted with the intent of conspiring with Sigma and Star to restrain price competition.

      c.  Sigma and Star manifested their understanding and acceptance of McWane's offer by publicly taking steps to limit their discounting from published price levels in order to induce McWane to support higher price levels.

      d.  On or about March 10, 2008, McWane and Sigma executives discussed by telephone their efforts to implement the January 2008 price increase.

27.    On June 17, 2008, McWane publicly announced its second DIPF price increase of 2008. Sigma and Star followed this price increase.

28.    The June 2008 price increase was the result of a combination and conspiracy among the Defendants.

      a.  Before announcing the June 2008 price increase, McWane planned to trade its support for higher prices in exchange for information from Sigma and Star documenting the volume of their monthly sales of DIPF. This exchange of

8

information was to be achieved under the auspices of an entity styled as the Ductile Iron Fittings Research Association ("DIFRA").

b. McWane communicated the terms of its plan to Sigma and Star, at least in part through a public letter sent by McWane to waterworks distributors, the common customers of the Defendants. A section of that letter was meaningless to distributors, but was intended to inform Sigma and Star of the terms of McWane's offer. McWane acted with the intent of conspiring with Sigma and Star to restrain price competition.

c. Sigma and Star manifested their understanding and acceptance of McWane's offer by initiating their participation in the DIFRA information exchange in order to induce McWane to support higher price levels.

d. McWane then led a price increase, and Sigma and Star followed.

e. On or about August 22, 2008, executives of McWane and Sigma discussed by telephone their efforts to implement the June 2008 price increase.

29. The DIFRA information exchange operated as follows. The Defendants submitted a report of their previous month's sales to an accounting firm. Shipments were reported in tons shipped, subdivided by diameter size range (*e.g.,* 2-12") and by joint type. Data submissions were aggregated and distributed to the Sellers. Data submitted to the accounting firm was typically no older than 45 days, and the summary reports returned to the Sellers contained data typically no more than 2 months old.

30. During its operation between June 2008 and January 2009, the DIFRA information exchange enabled each of the Sellers to determine and to monitor its own market

share and, indirectly, the output levels of its rivals. In this way, the DIFRA information exchange facilitated price coordination among the Sellers on the pricing of DIPF.

31.     The acts and practices of Defendants, as alleged herein, have the purpose, capacity, tendency, and effect of (i) fixing, maintaining and raising prices of DIPF in the various states alleged herein, and (ii) facilitating collusion in these states' DIPF markets.

### Market Factors Supporting Conspiracy

32.     The relevant DIPF markets have several features that facilitate collusion among Defendants, including product homogeneity, market concentration of DIPF suppliers, barriers to timely entry of new DIPF suppliers, inelastic demand at competitive prices, and uniform published prices.

33.     DIPF are commodity products produced to industry-wide standards. Product homogeneity enhances Defendants' ability to collude on prices and to detect deviations from those collusive prices.

34.     The relevant DIPF market is highly concentrated. In 2008, Defendants collectively made more than 90 percent of sales in the relevant DIPF markets. A highly concentrated market enhances Defendants' ability and incentive to collude on prices.

35.     The DIPF market is subject to significant barriers to entry, including the need for a new entrant to develop a distribution network and a reputation for quality and service with waterworks distributors and end users. Convincing end users to allow the use of a new entrant's DIPF is often a time consuming process.

36.     Demand for DIPF is inelastic to changes in price at competitive levels. DIPF are a relatively small portion of the cost of materials of a typical waterworks project, and there are no widely used substitutes for the product.

10

37. Defendants publish nearly identical price books listing per-unit prices for each unique DIPF item carried by a given supplier, and periodically publish uniform multiplier discounts at which they offer to sell DIPF on a state-by-state basis. By simplifying and standardizing published prices, the DIPF price list/multiplier format enhances the Sellers' ability to collude on prices and to detect deviations from those collusive prices.

## PLAINTIFF AND THE CLASSES SUFFERED ANTITRUST INJURY

38. Defendants' price-fixing conspiracy had the following effects, among others:

    a. Price competition has been restrained or eliminated with respect to DIPF;

    b. The prices of DIPF have been fixed, raised, maintained, or stabilized at artificially inflated levels; and

    c. Indirect purchasers of DIPF have been deprived of free and open competition.

39. During the Class Period, Plaintiff and the members of the Classes as defined herein have paid supra-competitive prices for DIPF.

40. DIPF follow a traceable physical chain of distribution from the Defendants to waterworks distributors to Plaintiff and the members of the Classes. Tracing can help show that changes in the prices paid by direct purchasers of DIPF affect prices paid by indirect-purchasers of DIPF.

41. The inflated prices of DIPF resulting from Defendants' price-fixing conspiracy have been passed on to Plaintiffs and the other Class members by Defendants and waterworks distributors.

42.     By reason of the alleged violations of the antitrust and other laws, Plaintiff and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for DIPF than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent

**ACCRUAL OF CLAIM, EQUITABLE TOLLING,
COTINUING VIOLATION, AND FRAUDULANT CONCEALMENT**

43.     On January 4, 2012, the Federal Trade Commission ("FTC") announced publicly that it had filed complaints against the Defendants.  The FTC charged that Defendants illegally conspired to set and maintain prices for pipe fittings, and that McWane illegally maintained its monopoly power in the market for U.S.-made pipe fittings.

44.     Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein prior to its disclosure on January 4, 2012 as a result of the FTC's investigation.

45.     Since the start of the Class Period, Defendants have committed continuing violations of the antitrust and unfair competition laws resulting in monetary injury to Plaintiff and Class members. These violations each constituted injurious acts.

46.     In addition, the illegal agreement, understanding and conspiracy of Defendants was kept secret. As a result, Plaintiff and Class members were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for DIPF in the United States throughout the Class Period. Defendants affirmatively and fraudulently concealed their unlawful conduct.

47.     Plaintiff and Class members did not discover, nor could they have discovered through reasonable diligence, that Defendants were violating the antitrust and unfair competition laws until shortly before this litigation was initially commenced, because Defendants and their co-conspirators used deceptive and secret methods to avoid detection and to affirmatively conceal their violations.

48.     Defendants did not tell Plaintiff, Class members or members of the public that they were fixing prices, or engaging in the other unlawful collusive practices alleged herein. By its very nature, the conspiracy by Defendants was inherently self-concealing.

49.     Defendants engaged in a successful price-fixing and customer allocation conspiracy that they affirmatively concealed by, inter alia,

> a. Communicating in secret (and even going so far as to conceal the terms of the plan in a letter to waterworks distributors) to discuss pricing customers and markets of DIPF in the United States;
>
> b. Using DIFRA to exchange information regarding sales and pricing;
>
> c. Sending communications in a manner or taking actions in a manner designed to hide the origin or purpose of the communication or action.

50.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants, Plaintiff and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until January 2012, when reports of the investigations into anti-competitive conduct concerning DIPF were first publicly disseminated.

51.    As a result of Defendants' fraudulent concealment of their conspiracy, the running

of any statute of limitations has been tolled with respect to any claims that Plaintiff and the

members of the Classes have alleged in this Complaint.

## CLASS ACTION ALLEGATIONS

52.    Plaintiff brings this action on behalf of itself and as a class action under Rule

23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief

on behalf of the following class (the "Nationwide Class"):

> All municipal subdivisions and other governmental entities that,
> during the period January 11, 2008 through January 31, 2009,
> purchased DIPF indirectly, for their own use, from Defendants
> and/or their co-conspirators. Excluded from the Nationwide Class
> are Defendants, their co-conspirators and their officers, employees,
> agents, representatives, parents, subsidiaries and affiliates.

53.    Plaintiff also brings this action on behalf of itself as a class action under Rule

23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to state

antitrust, unfair competition and common laws on behalf of the following class (the "Damages

Class"):

> All municipal subdivisions and other governmental entities that
> purchased DIPF indirectly, for their own use, from Defendants
> and/or their co-conspirators, from January 11, 2008 through
> January 31, 2009, in the following states: Arizona, California,
> District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas,
> Maine, Michigan, Minnesota, Mississippi, Montana, Nebraska,
> Nevada, New Hampshire, New Mexico, New York, North Carolina,
> North Dakota, Oregon, South Carolina, South Dakota, Tennessee,
> Utah, Vermont, West Virginia, and Wisconsin. Excluded from the
> Damages Class are Defendants, their co-conspirators and their
> officers, employees, agents, representatives, parents, subsidiaries
> and affiliates.

54.    Plaintiff reserves the right to amend the Class definitions prior to certification.

14

55.    Plaintiffs do not know the exact size of the Classes. However, due to the nature of the trade and commerce involved, there are thousands of Class members geographically dispersed across the United States such that joinder is impracticable

56.    Class members are identifiable from information and records in their possession, in Defendants' possession, and in third parties' possession.

57.    There are questions of law and fact common to the Class. These common questions relate to the existence of the conspiracy alleged, the conduct of the Defendants in agreeing to participate and participating in the conspiracy, and to the type and common pattern of injury sustained as a result thereof. The questions include but are not limited to:

        a.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain, and/or stabilize the price charged for DIPF sold in the United States;

        b.    The identity of participants in the conspiracy;

c.    The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants and their co-conspirators in the furtherance of the conspiracy;

d.    Whether Defendants took steps to actively conceal the conspiracy from Plaintiff and other Class members;

e.    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

f.    Whether the alleged conspiracy violated state antitrust and unfair competition law, as alleged in the Second and Third Claims for Relief;

g.      Whether Defendants unjustly enriched themselves to the detriment of the Plaintiff and the members of the Classes, thereby entitling Plaintiff and the members of the Damages Class to disgorgement of all benefits derived by Defendants, as alleged in the Third Claim for Relief;

h.      Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiff and other members of the Damages Class;

i.      The effect of Defendants' conspiracy on the prices of DIPF sold by Defendants during the Class Period; and

j.      The appropriate measure of damages sustained by Plaintiff and other members of the Damages Class.

58.     Plaintiff's claims are typical of the claims of other members of the Classes, and Plaintiff will fairly and adequately protect the interests of those Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Classes. Plaintiff has retained competent counsel experienced in the prosecution of antitrust class action litigation.

59.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

60.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

61.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of

16

repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by members of the Class that otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

**INTERSTATE TRADE AND COMMERCE**

62.     The conduct of Defendants and their co-conspirators has taken place in, and affected the continuous flow of, interstate trade and commerce of the United States, in that, *inter alia*:

      a.   Defendants and their co-conspirators have sold DIPF throughout the United States;

      b.   Defendants and their co-conspirators have each used instrumentalities of interstate commerce to sell DIPF throughout the United States;

      c.   In furtherance of the conspiracy alleged herein, Defendants have traveled between states and have exchanged communications through interstate wire communications and via U.S. mail; and

      d.   The conspiracy alleged herein has affected millions of dollars of commerce. Defendants and their co-conspirators have inflicted antitrust injury by artificially raising prices paid by Plaintiffs and other entities who are themselves engaged in commerce.

17

## VIOLATIONS ALLEGED
## FIRST CLAIM FOR RELIEF

### (Violation of Section I of the Sherman Act)

63.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

64.     Beginning at a time unknown to Plaintiffs, but at least as early as January 15, 2008 through at least January 31, 2009, the exact dates being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators, entered into a continuing agreement, understanding, and conspiracy to unreasonably restrain trade and commerce in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

65.     The contract, combination or conspiracy consisted of a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of DIPF sold to municipal subdivisions and other governmental entities in the United States.

66.     In formulating and carrying out the alleged agreement, understanding, and conspiracy, the Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to the acts, practices, and course of conduct set forth above.

67.     In particular, Defendants have combined and conspired to fix, raise, maintain or stabilize the prices of DIPF sold in the United States. Defendants, by their unlawful conspiracy, artificially raised, inflated and maintained the market prices of DIPF as herein alleged:

> a.   Participated in meetings and conversations to discuss the prices and supply of DIPF in the United States;

18

     b.   Agreed to manipulate prices and limit supply of DIPF sold in the United

States in a manner that deprived direct and indirect purchasers of DIPF of free

and open competition;

     c.   Issued price announcements and price quotations in accordance with the

agreements reached;

     d.   Sold DIPF to customers in the United States at non-competitive prices; and

     · e.   Invoiced customers in the United States at the agreed-upon, fixed prices for

DIPF and transmitting such invoices via U.S. mail and other interstate means

of delivery.

68.     The combination and conspiracy alleged herein has had the following effects,

among others:

     a.   Price competition in the sale of DIPF has been restrained, suppressed and/or

eliminated in the United States;

     b.   Prices for DIPF sold by the Defendants and their co-conspirators have been

fixed, raised, maintained and stabilized at an artificially high non-competitive

level in the United States; and

     c.   Municipal and other governmental purchasers of DIPF have been denied the

benefits of free and open competition.

69.     As a direct result of the unlawful conduct of Defendants and their co-conspirators

in furtherance of their continuing contract, combination or conspiracy, Plaintiffs and the

members of the Nationwide Class have been injured and will continue to be injured in their

business and property by paying more for DIPF purchased indirectly from the Defendants and

their co-conspirators than they would have paid and will pay in the absence of the combination and conspiracy.

70.     Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs and the Nationwide Class seek the issuance of an injunction against Defendants, preventing and restraining the violations alleged herein.

## SECOND CLAIM FOR RELIEF
### (Violation Of State Antitrust and Related Statutes on behalf of Plaintiff and the Damages Class as Against All Defendants)

71.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

72.     From at least as early as January 11, 2008 until at least January 31, 2009, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of DIPF in unreasonable restraint of trade and commerce and in violation of the various state statutes set forth below.

73.     The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain, at artificially supra-competitive levels, prices for DIPF in the United States.

74.     In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

>    a. participating in conversations and communications among themselves during which they agreed to price DIPF at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiff and members of the Damages Class with respect to DIPF sold in the United States; and

20

          b.   participating in conversations and communications among themselves to implement adhere and police the agreements they made.

75.     Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain or stabilize prices and to allocate customers with respect to DIPF.

76.     Defendants' anti-competitive acts described above constitute violations of the state statutes that follow.

77.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, et seq.

78.     Defendants have entered into an unlawful agreement in restraint of trade in violation of California's Cartwright Act,  Cal. Bus. & Prof. Code §§ 16700, *et seq.*

79.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated, §§ 28-4501, *et seq.*

80.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

81.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Hawaii Revised Statutes Annotated, §§ 480-1, *et seq.*

82.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq.*

83.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code, §§ 553.1, *et seq.*

84.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

85.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes Annotated, 10 §§ 1101, *et seq.*

86.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated, §§ 445.771, *et seq.*

87.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Statutes Annotated, §§ 325D.49, *et seq.*

88.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated, §§ 75-21-1, *et seq.*

89.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq.*

90.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes, §§ 59-801, *et seq.*

91.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Unfair Trade Practice Act, Nev. Rev. Stat. §§ 598A.010, *et seq.*

92.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes, §§ 356:1, *et seq.*

93.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated, §§ 57-1-1, *et seq.*

94.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Law, §§ 340, *et seq.*

95.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes, §§ 75-1, *et seq.*

96.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code, §§ 51-08.1-01, *et seq.*

97.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes, §§ 646.705, *et seq.*

98.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Carolina's Unfair Trade Practices Act, S.C. Code Ann., §§ 39-5-10, *et seq.*

99.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws, §§ 37-1-3.1, *et seq.*

100.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated, §§ 47-25-101, *et seq.*

101.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated, §§ 76-10-911, *et seq.*

102.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Statutes Annotated, 9 V.S.A. §§ 2453, *et seq.*

103.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Antitrust Act, W. Va. Code §§ 47-18-1, *et seq.*

104.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes, §§ 133.01, *et seq.*

105.     Plaintiff and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement.  Plaintiff and members of the Damages Class have paid more for DIPF than they otherwise would have paid in the absence of Defendants' unlawful conduct.  This

injury is of the type the laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

106. In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anti-competitive conduct come at the expense and detriment of members of the Plaintiff and the members of the Damages Class.

107. Accordingly, Plaintiff and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's applicable law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

### THIRD CLAIM FOR RELIEF
**(Unjust Enrichment On behalf of Plaintiff
and the Damages Class as against all Defendants)**

108. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

109. As a result of their unlawful conduct described above, Defendants have been unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of DIPF.

110. Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff or the members of the Damages Class for DIPF.

111. Plaintiff and the member of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust and inequitable conduct. Plaintiff and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and the members of the Damages Class may make claims on a pro rata basis.

24

**PRAYER FOR RELIEF**

Accordingly, Plaintiff respectfully requests that:

A.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes, that Plaintiff be appointed as Class representative, and that Plaintiff's counsel be appointed Interim Lead Counsel for the Classes.

B.     That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

(a)     An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(b)     A per se violation of Section 1 of the Sherman Act;

(c)     An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition laws as set forth herein; and

(d)     Acts of unjust enrichment by Defendants as set forth herein.

C.     Plaintiff and the members of the Damages Class recover damages, to the maximum extent allowed under the relevant laws, and that a joint and several judgment in favor of Plaintiff and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.     Plaintiff and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, including in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.     Defendants their affiliates, successors, transferees, assignees and other officers, directors, partners, agents, and employees thereof, and all other person acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and form adopting or following any practice, plan, program or device having a similar purpose or effect;

F.     Plaintiff and the members of the Damages Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

G.     Plaintiff and the members of the Classes recover their costs of suit, including reasonable attorney's fees, as provided by law; and

H.     Plaintiff and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

26

Dated: February 7, 2012

Respectfully submitted,

By:    s/ Lisa J. Rodriguez
           s/ Nicole M. Acchione
           Lisa J. Rodriguez
           Nicole M. Acchione
           **Trujillo Rodriguez & Richards, LLC**
           258 Kings Highway East
           Haddonfield, NJ 08033
           lisa@trrlaw.com
           nacchione@trrlaw.com

           **KIRBY McINERNEY LLP**
           David Kovel, Esq.
           Daniel Hume, Esq.
           David Bishop, Esq.
           825 Third Avenue, 16th Floor
           New York, New York 10022
           Phone: 212-317-2300
           Fax: 212-751-2540

27